ROBERT D. SPIEGLE AND DORIS LORRAINE SPIEGLE, HIS WIFE, PLAINTIFFS-APPELLANTS, v. BOROUGH OF BEACH HAVEN, IN THE COUNTY OF OCEAN, A MUNICIPAL CORPORATION, DEFENDANT-RESPONDENT.

Argued November 9, 1965—Decided March 21, 1966.

480

*Mr. James Mercer Davis, Jr.,* argued the cause for appellants.

*Mr. Franklin H. Berry, Jr.,* argued the cause for respondent (*Mr. Franklin H. Berry, Jr.,* of counsel; *Messrs. Berry, Whitson & Berry,* attorneys).

The opinion of the court was delivered by

HANEMAN, J. Judgments were entered in the Superior Court, Law Division, in two separate cases, holding, *inter alia,* that two ordinances as amended (which, for convenience, we shall hereafter refer to as (1) "fence ordinance" and (2) "dune ordinance") and adopted by defendant were constitutional. The separate appeals, limited to the constitutional issues, which were taken to the Appellate Division, were consolidated. Before argument in the Appellate Division, this Court certified the appeals on its own motion, *R. R.* 1 :10–1.

Plaintiffs are the owners of four ocean front tracts of land in the Borough of Beach Haven. The tracts are subdivided into building lots. The first tract is bounded on the northerly and southerly sides by Jefferis and Kentford Avenues respectively and is unimproved. The second tract is bounded by Kentford and Leeward Avenues and upon this tract plaintiffs have erected a residence. The third tract is bounded on the north by Leeward Avenue and on the south by Merivale Avenue. Upon this tract plaintiffs have erected a small two-story frame apartment house. The fourth tract is bounded by Merivale and Nelson Avenue and is unimproved.

On June 13, 1962 plaintiffs erected fences extending oceanward across the beach. On June 18, 1962 defendant razed the fences, leaving the posts lying on the beach. On July 31, 1962 defendant adopted Ordinance No. 62-10 (fence ordinance) which, as amended by Ordinance No. 62-14, provides in pertinent part:

"SECTION 1. Hereafter it shall be unlawful for any person, firm or corporation to erect, to cause to be erected or to maintain on any privately owned beach in the Borough of Beach Haven, east of the

dune line as established by the Borough's engineers, any fence, wall, post, piling, stake, or structures of any sort or which will in any way interfere with or impede any public official, public employee or contractor employed by any public body in the performance of work on any such beach to repair or prevent storm damage, without first obtaining a permit therefor from the Board of Commissioners of the Borough of Beach Haven.

SECTION 2. The permit referred to in Section 1 hereof shall be issued only after public hearing at a regular meeting of said governing body held at least seven days after publication of notice of such hearing in the Beach Haven Times."

Plaintiffs filed suit seeking recovery of damages for the demolition of the fence and challenging the constitutionality of the fence ordinance. Judgment was entered after trial, awarding plaintiffs $300 damages for the fence removal and upholding the constitutionality of the fence ordinance.

■ At the oral argument before this Court, defendant admitted that plaintiffs had a right under the several ordinances to a permit to erect a fence on their lands from the mean high water mark landward, subject, however, to the condition that the fence be not so designed as to impede or prevent beach protection work, including the passage of vehicles for such purposes. So construed, we conclude that the provision is a lawful and reasonable exercise of police power for the protection of public health and safety. This is especially so in light of *N. J. S. A.* 40 :92–9 which grants the governing body power to protect its ocean and beach front. *Cf. United States v. Caltex, Inc.*, 344 *U. S.* 149, 73 *S. Ct.* 200, 97 *L. Ed.* 157 (1952); *Rohrs v. Zabriskie*, 102 *N. J. L.* 473 (*Sup. Ct.* 1926); *Caldwell v. Saul*, 5 *N. J. Misc.* 165, 135 *A.* 691 (*Sup. Ct.* 1927); *Myers v. State*, 4 *N. J. Misc.* 251, 132 *A.* 335 (*Sup. Ct.* 1926); *Manning v. Hague*, 3 *N. J. Misc.* 329, 128 *A.* 375 (*Sup. Ct.* 1925); Annotation "Zoning regulation prohibiting or limiting fences, hedges or the like," 66 *A. L. R.* 2*d* 1294 (1959). No cross-appeal is taken from the judgment of $300.

The fence ordinance thus disposed of, we come to a consideration of the dune ordinance which constitutes the balance of this appeal.

On April 23, 1963 defendant adopted Ordinance No. 63-4 (dune ordinance) which was amended by Ordinance No. 63-5 and Ordinance No. 64-17. By amendment of the above referred to fence ordinance complaint, plaintiffs also challenged the constitutionality of the dune ordinance. The court below upheld its constitutionality. Summary judgment was also entered against plaintiffs in a separate suit challenging the constitutionality of Ordinance No. 64-17 which amended the dune ordinance.

The amended ordinance reads as far as here material:

*"ORDINANCE No. 63-4*

An ordinance to Define and Delineate the Beach and Dune Areas of the Borough of Beach Haven, and Establish Regulations for the Use and Protection Thereof, and Providing Penalties for the Violation Thereof.

The Board of Commissioners of the Borough of Beach Haven, in the County of Ocean, do Ordain:

SECTION 1.  SHORT TITLE:  This ordinance shall be known as the Borough of Beach Haven Beach Protection Ordinance.

SECTION 2.  FINDINGS AND DECLARATION:

(a) It has been clearly demonstrated that well established and protected sand dunes, together with berms, beaches and underwater slopes of suitable configuration and of proper grade and height, are a durable and effective protection against high tides and flooding, and against damage by the ocean under storm conditions, and are the natural protections of the coastal areas adjacent thereto, and the State and its subdivisions and their inhabitants have an interest in the continued protection thereof, and in the right to restore them in the event of damage or destruction.

(b) Said dunes are vulnerable to erosion by both wind and water, but primarily by wind, since its attacks against the dunes are sustained for substantial and frequently recurring periods of time whereas, if protected by typical berms, beaches and underwater slopes, the dunes are attacked by water only at infrequent intervals. The best available means of protecting said dunes against wind erosion is by preventing indiscriminate trespassing, construction or other acts which might destroy or damage said dunes, and through the use of native plantings, supplemented by sand fencing and other devices designated to prevent the free blowing of sand and the maintenance of the surface tensions, root accumulations, normal contours and other features found in typical natural dunes.

(c) The immediate dune and beach area is not capable of rigid definition or delineation, or of completely firm stabilization, so that particular sites, at one time free of dunes, may, as a result of natural

forces, become part of the dune area necessary for the continuation of the protection above outlined, and persons purchasing or owning such property do so subject to the public interest therein.

(d) It is the purpose of this Ordinance to define the areas so affected and to establish regulations to assure their continued effectiveness. This Ordinance is declared to be an exercise of the police power in the interest of safety and welfare and for the protection of persons and property.

(e) The erosion of the beachfront during the storm of March 6th and 7th, 1962, has created an immediate and imminent threat and danger to life of persons and property in the Borough of Beach Haven by reason of the destruction of the sand barriers which protect the Borough's oceanfront to the end that it has become necessary to the health, safety and welfare of the Borough to repair, restore, replace or construct protective barriers on both public and private property within the Borough of Beach Haven.

(f) The interference with or the depletion of the beach and sand dunes tends to permit encroachment by the sea and the conditions above recited make it imperative that the governing body regulate and control the removal of sand from the beach or dunes or any other interference with or depletion of the protective barrier on the oceanfront of the Borough of Beach Haven.

SECTION 3. DEFINITIONS:

*Backshore:* That zone of the shore or beach lying between the foreshore and dune area, and normally acted upon by waves only during severe storms, especially when combined with exceptionally high water.

*Beach:* The zone of unconsolidated material that extends landward from the low water line to the place where there is marked change in the material of physiographic form, i. e. dune or bulkhead. Includes Foreshore and Backshore.

*Strand:* The same area included within the definition of Beach.

*Beach-Dune Area:* The district set off by this Ordinance, to include the dunes, beaches, strand, backshore and foreshore, and the areas where, according to a normal beach profile, the same would or should exist. The Beach-Dune area, as defined therein has been established by Taylor, Wiseman, Taylor and Sleeper, Consulting Engineers, and constitutes all that area lying eastwardly of the Building Line as hereafter defined.

*Boardwalk:* This shall include the term 'walkway' and shall mean a walk or promenade of planking built across the dune line or berm(s) to connect the street ends or other property with the open beach. These shall be perpendicular to the western boundary of the dune zone, and in no case shall a wooden promenade parallel to or along the beach be permitted. The height, width, length and type of construction of these must be approved by the Borough Engineer.

*Dunes:* A hill of sand accumulated along the beach front, usually by natural means. It shall extend from the backshore to the line where the normal leeward slope intersects the established grade of the hinterland.

486

*Dune Area:* The area actually or normally occupied by dunes. For purposes of this Ordinance it shall be construed to include its actual dimensions or according to a computed profile with a height of 14' above mean sea level, a crest of 20' and a leeward slope of 1:5, whichever shall be greater, but not greater than 50' from the average seaward side of the dune crest as computed by the Borough Engineer and provided further that the leeward slope shall in no case be made steeper than 1:5.

*Dune Line:* This shall mean a row of dunes, which may blend in with a berm, or berms, which blend in with each other, are roughly parallel to the ocean, and serve as a protective barrier against the elements.

*Foreshore:* The part of the shore, lying between the crest of the seaward berm and the ordinary low water mark, that is ordinarily traversed by the uprush and backrush of the waves.

*Mean Sea Level:* This shall include the term 'sea level' and shall refer to the 1929 Sea Level Datum established by the U. S. Coast and Geodetic Survey, or, such other datum as may be established by the U. S. Army Corps of Engineers or other properly authorized agencies.

*Natural Dune:* A dune created by natural forces, or one that has developed the contours, vegetation, root systems, etc., characteristic of dunes so created.

*Natural Vegetation:* This shall include the terms 'native vegetation' or 'indigenous vegetation.' Specifically it shall mean such plants as beachgrass (Ammophila breviligulata), dusty miller (Artiemisia stelleriana), hudsonia (Hudsonia tomentosa), sea rocket (Cakile endentula), seaside goldenrod (Solidago sempervirens), bayberry (Myrica Pennsylvanica), or beach plum (Prunus maritima) which normally grow, or may be planted on the slopes of dunes or behind them; no distinction is made as to how such plants are introduced into their locations.

*Sand Fence:* This shall include the term 'snow fence' and may mean either of two types of barricade established in a line or a pattern to accumulate sand and aid in the formation of a dune.

(a) brush type—This consists of dead bushes, trees, reeds or similar debris collected in bundles and fixed by stakes or similar means.

(b) picket type — This shall be the commercial variety of light wooden fence, held together by wire and secured by posts.

*Slope, leeward:* This shall be the face or surface of the dune or berm going from its crest or plateau away from the ocean.

*Bulkhead Line and Building Line:* The lines so designated on maps entitled Bulkhead and Building Line at Atlantic Ocean, Chatsworth Avenue to North Borough Line, Borough of Beach Haven, Ocean County, New Jersey, and Bulkhead and Building Line at Atlantic Ocean, Chatsworth Avenue to South Borough Line, Borough of Beach Haven, Ocean County, New Jersey, both prepared by Taylor, Wiseman, Taylor and Sleeper, Consulting Engineers, dated June 1964 and on file in the office of the Borough Clerk.

SECTION 4. A. This Ordinance shall be applicable to the beach-dune area as hereinbefore defined.

B. No construction of any sort shall be allowed in the foreshore or backshore areas thereof excepting protective works undertaken by the Borough with the approval of the Bureau of Navigation of the State of New Jersey and/or the U. S. Army Corps of Engineers, as applicable.

C. No construction of any sort shall be allowed in the remainder of the Beach-Dune Area except the following:

1. Any use mentioned in paragraph B above.

2. Boardwalks and steps to permit access across the dunes or berms to the open beach, without damage to the dunes themselves.

3. Sand fences to encourage the accumulation of sand.

4. Pavilions or similar small platforms of less than 300 square feet in area, provided they do not have more than 40% solid walls, are mounted on suitable pilings, and the area for 20 feet around them is suitably planted with beach grass or other natural vegetation capable of stabilizing the sand in such area, provided further it shall be established to the satisfaction of the Borough Engineer that the proposed design and construction methods as applied to the particular site situation and time will not:

(a) unreasonably disturb the existing dunes.

(b) be likely to create wind currents detrimental to the existing dunes.

(c) be likely to create, increase, or prolong any other hazard.

The design and construction of any such pavilion or platform shall include any feature, device or provision required by the Borough Engineer to carry out the intent of this Ordinance.

5. A bulkhead designed to replace or supplement dunes as herein described, provided that, before any permit shall issue or be effective for the construction of any such bulkhead it shall be demonstrated by competent engineering studies and design that such bulkhead will:

(a) In every respect provide as much protection as the dunes intended to be in such area, in optimum condition, would provide.

(b) Create, increase, or prolong no condition likely to be detrimental to the maintenance of an adequate dune line.

(c) Conform adequately with the overall beach protection plans of the Borough, the Bureau of Navigation, and the U. S. Army Corps of Engineers.

(d) No bulkhead shall be constructed eastwardly of the bulkhead line as defined in Section 3 hereof.

The Governing Body shall conduct or require such hearings, and the production of such proofs as it shall reasonably consider necessary to establish the foregoing.

D. Access to the open beach in this zone shall be obtained only across street ends or along properly constructed and authorized boardwalks and steps. Where boardwalks and steps are constructed in street end extensions, access shall be across such boardwalks and steps only.

E. The Borough may erect or require the construction of fencing along the western limits of the backshore and dune areas and provide or require suitable markings to identify the same. Persons may enter such areas only to carry out the purposes of this Ordinance. Where walkways or boardwalks exist, the same shall be suitably bordered with fences to prevent damage to the dunes or berms which they cross.

F. No individual, firm or corporation shall authorize or participate in any manner in the moving or displacement of sand within the beach-dune area unless a permit therefor shall have been issued pursuant to an application in writing to the Board of Commissioners. Said application shall contain the following information.

1. Name and address of the applicant.

2. Location of sand to be moved or displaced.

3. The nature and purpose of the proposed moving or displacement.

4. Proposed method by which the applicant desires to move or displace the same, including a description of the equipment, machinery or other apparatus to be used.

5. Estimate in terms of cubic yards as to the quantity of sand to be moved or displaced.

6. Such other information as may be required by the Board of Commissioners.

No such permit shall be issued without a determination by the Board of Commissioners based upon an inspection of the area involved and a report thereon by the Borough Engineer that such removal will not create or increase a danger or hazard to life or property. No permit will be granted if the proposed moving or displacement will:

1. Adversely affect the littoral drift on the beach-dune area.

2. Result in a reduction of dune protection and the dune-area as defined in Section 3 of this Ordinance; and

3. Interfere with the general configuration of the beach-dune area of the subject property or neighboring properties.

G. No permit will be granted and it shall be unlawful for any individual, firm or corporation to authorize or participate in:

1. The removal of sand from the beach-dune area or from any street end.

2. The removal or destruction of natural vegetation within the beach-dune area.

H. Where by the action of high winds and/or tides, sand is blown or washed upon the lands, including street ends, lying westwardly from the dune line, such sand shall not be removed from said lands unless a permit therefor shall have been issued pursuant to and in full compliance with the requirements set out in Paragraph F above."

Under the amended dune ordinance there is created a Foreshore Area encompassing the lands between the mean low and high water lines. Landward of the Foreshore lies a Backshore Area which extends from the mean high water line to a Bulk-

head Line. The Bulkhead Line was established by and is shown on a map prepared by Wiseman, Taylor and Sleeper, consulting engineers, which map is incorporated into the ordinance by reference. Landward and 20 feet distant from the Bulkhead Line lies a Building Line also established by said engineers and shown on said map. The stretch of land lying between the Bulkhead and Building Lines is designated as a Dune Area.

From the mean low water line to the Building Line, no construction is permitted except for fences, sand fences, boardwalks and steps to permit access to the beach over the Dune Area, pavilions or similar small platforms of less than 300 square feet, and bulkheads. Plaintiffs' first tract is almost entirely oceanward of the Building Line. Although the second tract lies on both sides of the Building Line the residence constructed on said tract lies wholly landward. The Building Line cuts through the third tract in such a way as to diagonally bisect the apartment house from its southeast to its northwest corner. The fourth tract of land is completely oceanward of the Building Line. In brief, plaintiffs own property on both sides of the Building Line.

Plaintiffs argue that the ordinance, as applied to them, constitutes a taking of their property for public purposes without just compensation. They rationalize that the regulations are so onerous that the uses to which their lands may now be put are minimal. They conclude that this barring of any real beneficial use constitutes a taking under the police power and is unconstitutional. They argue as well that the ordinance is unreasonable, vague and indefinite both in purpose and standards and hence unconstitutional.

Generally, it must be recognized that private property cannot be taken for public use without compensation. *N. J. Const., Art.* 1, *par.* 20; *U. S. Const. Amend.* XIV.

Ordinarily the question arises in eminent domain cases where the property has been taken directly. However, the right to compensation has been held as viable where the prop-

erty has been indirectly taken through excessive regulation under the police power.

In *Morris County Land, etc. v. Parsippany-Troy Hills Tp.,* 40 *N. J.* 539 (1963), Mr. Justice Hall said, at *p.* 554:

"'\* \* \* The measures here adopted to accomplish public benefits do not amount to a direct or outright taking, as were those struck down in *Grosso v. Board of Adjustment of Millburn Township,* 137 *N. J. L.* 630 (*Sup. Ct.* 1948), where use of the plaintiff's property was precluded by placing the lot in the bed of a proposed street on the official map; in *Hager v. Louisville & Jefferson County Planning & Zoning Commission,* 261 *S. W.* 2d 619 (*Ky. Ct. App.* 1953), where the plaintiff's land was rendered useless by zoning it as ponding areas for temporary storage basins in accordance with a flood control plant; and in *Miller v. City of Beaver Falls,* 368 *Pa.* 189, 82 *A.* 2d 34 (*Sup. Ct.* 1951), where private utilization of the tract was inhibited for a period of years, pursuant to a statute, by its inclusion in a territory encompassed by an ordinance adopting a general plan for present and future parks.

But a taking may as well occur indirectly through excessive regulation under the police power. Thus, in *Yara Engineering Corp. v. City of Newark,* 132 *N. J. L.* 370 (*Sup. Ct.* 1945), a so-called airport zoning ordinance which restricted the height of structures within designated distances of an airport and otherwise regulated use of such property so as not to endanger or interfere with the landing or takeoff of aircraft, was held unconstitutional as amounting to an appropriation of rights in private property which could only be acquired by eminent domain. And in *Joint Meeting of the City of Plainfield v. Borough of Middlesex,* 69 *N. J. Super.* 136 (*Law Div.* 1961), defendant zoned plaintiff's property exclusively for school, park and playground use as a method of depreciating its value for purposes of municipal purchase. The zoning was held invalid as unconstitutionally depriving the owner of the full value of its property. The universal truth of the pithy observation of Mr. Justice Holmes in *Pennsylvania Coal Co. v. Mahon,* 260 *U. S.* 393, 415, 43 *S. Ct.* 158, 160, 67 *L. Ed.* 322, 326 (1922), must not be disregarded:

'The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. \* \* \* We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.' "

■ The problem of how far a governmental agency may restrict the use of lands without breaching the constitutional

mandates against taking without compensation is a most confused and troublesome one. It is unclear from the cases when the economic loss suffered by a private citizen ceases to be regarded as a mere incident of the lawful exercise of police power and becomes an unconstitutional deprivation of property. No plain and catholic formula exists to ascertain the outside limits to which a regulation upon the use of land under the police power without compensation may extend. *United States v. Caltex, Inc.*, 344 *U. S.* 149, 156, 73 *S. Ct.* 200, 97 *L. Ed.* 157, 163 (1952); *Goldblatt v. Town of Hempstead*, 369 *U. S.* 590, 594, 82 *S. Ct.* 987, 8 *L. Ed. 2d* 130 (1962); Sax, "Taking and the Police Power," 74 *Yale L. J.* 36 (1964); Dunham, "Griggs v. Allegheny County in Perspective; Thirty Years of Supreme Court Expropriation Law," 1962 *Supreme Court Review* 63. We, however, do not reach this problem in the case *sub judice*.

Here, plaintiffs assert that the ordinance is unconstitutional because if the regulations were enforced against their particularly described land they would be deprived of its use. No objection is grounded on an arbitrary or unreasonable exercise of police power because of the lack of necessity for action or erroneous means adopted to accomplish that result. They do not contest either the municipal finding that a condition exists which constitutes a present public danger or that the means set forth in the ordinance for alleviating or remedying that condition are suitable for the accomplishment of that purpose, nor do they suggest any other effective or less burdensome means capable of counteracting the danger. Rather, the contest of the constitutionality is based solely on the impact that the regulations have upon the useability of plaintiffs' lands.

To sustain such an attack, the burden is cast upon a plaintiff to prove that the ordinance unduly burdens his beneficial use of the land. *Goldblatt v. Hempstead*, 369 *U. S.* 590, 82 *S. Ct.* 987, 8 *L. Ed. 2d* 130 (1962). It follows that an essential element of plaintiff's proof is the existence of

some present or potential beneficial use of which he has been deprived.

Plaintiffs failed to adduce proof of any economic use to which the property could be put. The borough, on the other hand, adduced unrebutted proof that it would be unsafe to construct houses oceanward of the building line (apparently the only use to which lands similarly located in defendant municipality have been put), because of the possibility that they would be destroyed during a severe storm—a result which occurred during the storm of March 1962. Additionally, defendant submitted proof that there was great peril to life and health arising through the likely destruction of streets, sewer, water and gas mains, and electric power lines in the proscribed area in an ordinary storm. The gist of this testimony was that such regulation prescribed only such conduct as good husbandry would dictate that plaintiffs should themselves impose on the use of their own lands. Consequently, we find that plaintiffs did not sustain the burden of proving that the ordinance resulted in a taking of any beneficial economic use of their lands.

Plaintiffs additionally argue that the denial of the right of promiscuous pedestrian crossing of the dunes and the obligation to construct boardwalks or steps for access to the beach are an unlawful taking. The answer to that contention is that the restriction is sustained by the proof as necessary to maintain a dune line and the curtailment of plaintiffs use of their land in that respect is also *de minimis*, and must be suffered in the interest of public good. *Fred v. Mayor and Council, Old Tappan Borough*, 10 *N. J.* 515 (1952).

Plaintiffs also assert that the ordinance prevents the use of so much of their apartment house as lies within the Dune Area. The ordinance was not intended to nor does it apply to the use and occupancy of buildings existing on its effective date and lying within the Dune Area. It is prospective only and relates to construction thereafter undertaken.

Plaintiffs have failed to demonstrate that the ordinances result in a taking and hence are unconstitutional.[1]

We come to plaintiffs' final argument that the ordinances are unreasonable and void because they are indefinite both in standards and purposes.

They point first to the definitions as not setting forth tests with mathematical certainty. Plaintiffs seem to object to the ordinance because the various zones are not described by metes and bounds. The very nature of the subject matter of the definitions prevents more specific language than that employed. The shifting and unstable high water line and Dune Area are not susceptible of more particular description. The definitions are sufficiently clear and definite to furnish adequate information as to what was intended and to act as a restraint against arbitrary enforcement.

The standards furnished by the ordinance for the guidance of the borough engineer in passing upon an application for leave to erect one of the permitted types of construction which plaintiffs secondly argue are vague and uncertain, although in general terms, are also as precise as the situation permits. The ordinances furnish an adequate standard against which to measure official action and to prevent the exercise of unbridled and arbitrary power in the enforcement thereof by the municipal government. See *Ward v. Scott,* 11 *N. J.* 117, 123 (1952); *Bechler v. Parsekian,* 36 *N. J.* 242, 255 (1961); *Switz v. Kingsley,* 37 *N. J.* 566, 581 (1962).

---

[1] We have not mentioned *Lorio v. Sea Isle City,* 88 *N. J. Super.* 506 (*Law Div.* 1965), where a trial court held there was a taking requiring condemnation by reason of governmental construction of a protective sand dune on the plaintiffs' property. Beyond the conclusory statement that the dune denied all use of the land, no facts are given in the opinion as to the nature or location of the property, the extent of the dune thereon or what beneficial use the property was or could be put to previously which is now prevented. We therefore express no view on the result there reached or the relation of the decision to what we have said in the instant case.

Affirmed without prejudice, however, to any further proceedings based upon a claim and showing of an actual taking of a beneficial use.

HALL, J., concurring in result.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.