705 A.2d 1221

EDMUND T. KARAM AND BARBARA KARAM, H/W, PLAINTIFFS–RESPONDENTS, v. STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, ROBERT C. SHINN, COMMISSIONER OF THE DEPARTMENT OF ENVIRONMENTAL PROTECTION, DEFENDANTS–APPELLANTS, AND CHICAGO TITLE INSURANCE COMPANY, A CORPORATION, DEFENDANT.

PETER DIBIAGIO AND LAURA DIBIAGIO, H/W, INTERVENOR–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 22, 1998—Decided February 13, 1998.

Wefing, J.A.D., concurred with opinion.

228 

Before Judges BAIME, WEFING, and BRAITHWAITE.

*Alyssa Pearlman Wolfe,* Deputy Attorney General, argued the cause for appellants (*Peter Verniero,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Wolfe,* on the brief).

*Richard M. Hluchan,* argued the cause for respondents (*Levin & Hluchan,* attorneys; *Mr. Hluchan,* of counsel; *Jeffrey S. Beenstock,* on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

This is a regulatory taking case. In 1924, Charles and May Schweinert purchased from the State the riparian land adjoining their upland property situated along the Manasquan River. Under the riparian grant, the tide-flowed land could only be used for construction of a dock or recreational pier. The grant required common ownership of the upland property and the riparian land. Although the Waterfront and Harbor Facilities Act of 1914 (*N.J.S.A.* 12:5–1 to –11), more commonly known as the Waterfront Development Act, was in effect at the time the riparian grant was issued and required State approval as a condition for improving the tide-flowed land, the Schweinerts never applied for a permit and never sought to erect a dock on their property. Plaintiffs purchased both the upland and riparian lands in 1993, and sometime thereafter applied to the Department of Environmental Protection (DEP) for a permit. By this time, however, the riparian land was designated a "special restricted area" because it harbored high densities of shellfish. Following the DEP's denial of their application for a development permit, plaintiffs brought this inverse condemnation action. The Chancery Division granted partial summary judgment in plaintiffs' favor and certified its order as final. The State appeals. We reverse.

## I.

The salient facts are not in dispute. On May 19, 1924, the Board of Commerce and Navigation conveyed to the Schweinerts

the riparian land adjoining their upland property, restricting its use to the erection of a pier or dock. Although the upland and riparian parcels have consistently been delineated as separate lots on the municipal tax map and in the various deeds executed over the years, the grant required common ownership of the lands or the right to the tide-flowed property would become void.

Because the Waterfront Development Act was in place at the time the riparian grant was issued, a development permit was required as a condition for improving the tide-flowed property. The history of the regulatory framework promulgated under the Act is described at length in *Last Chance Development Partnership v. Kean*, 232 *N.J.Super.* 115, 556 *A.*2d 796 (App.Div.1989), *aff'd*, 119 *N.J.* 425, 575 *A.*2d 427 (1990), and need not be recited here. Ironically, the impetus for the statutory scheme came from the reports of the New Jersey Harbor Commission, a body appointed by Governor Woodrow Wilson, that recommended rapid and orderly development of the waterways to facilitate commerce and navigation. In the early 1970's, however, governmental focus shifted in favor of wildlife conservation and environmental protection. In 1973, the Legislature enacted the Coastal Area Facility Review Act (CAFRA), *see N.J.S.A.* 13:19–1 to –21, which, among other things, was designed to assure that any future development would be "reasonably consistent and compatible with the natural laws governing the physical, chemical and biological environment of the coastal area." *N.J.S.A.* 13:19–2. The DEP was empowered to adopt and amend rules and regulations to effectuate the purposes of the Act. *N.J.S.A.* 13:19–17. Pursuant to that authority, the DEP adopted *N.J.A.C.* 7:7E–3.2(d), which prohibits the construction of docks in certain classified waters.

In 1987, the Manasquan River was classified as a "special restricted area," meaning that it harbored moderate to high densities of shellfish that were uncontaminated and fit for human consumption. *See N.J.A.C.* 7:12–1.2 and *N.J.A.C.* 7:12–3.2. In 1993, the DEP's Bureau of Shellfisheries again surveyed the Manasquan River and reached the same conclusion. Because the

river serves as an active shellfish habitat, erection of a pier or dock in the tide-flowed land is prohibited.

Over the years, the Schweinerts subdivided their property along the river, always selling off the upland land with the riparian parcel to each purchaser. Before the river was classified as a "special restricted area," many of these property owners erected docks. Plaintiffs purchased the upland and riparian properties in 1993. Although the DEP's classification of the river as a "special restricted area" was a matter of public record at the time of the purchase, plaintiffs were unaware of the prohibition against the construction of docks. Relying on their riparian grant and the docks that had previously been erected on neighboring properties, plaintiffs applied for a development permit. On May 11, 1993, the DEP denied plaintiffs' application.

Plaintiffs brought this action. During the litigation, plaintiffs sold the upland and riparian lands for $1,100,000, conditioned upon their continued pursuit of this inverse condemnation claim. In a brief oral opinion, the Chancery Division granted plaintiffs' motion for partial summary judgment, finding that the DEP's denial of a development permit deprived the property owners of any viable economic use of the riparian grant. This appeal followed.

## II.

We deal again with the complexities attendant to claims of inverse condemnation. Commonly, constitutional questions involve no more than a value judgment upon a factual complex rather than an evident application of a precise rule of law. Inevitably, resolution of such issues reflect the seasoning and experience of the one who judges, which in turn hinge upon the concerns and problems confronting the court when the issue is presented and decided. This observation is particularly compelling in the context of Fifth and Fourteenth Amendment "taking" jurisprudence, where the courts often engage in "ad hoc, factual inquiries," determining issues on a case-by-case basis. *Kaiser Aetna v. United States*, 444 *U.S.* 164, 175, 100 *S.Ct.* 383, 390, 62

*L.Ed.*2d 332, 343 (1979); *see also Gardner v. New Jersey Pine-lands Comm'n*, 125 *N.J.* 193, 205, 593 *A.*2d 251 (1991) (application of takings principles requires "fact-sensitive" examination of the regulatory scheme and the extent to which it interferes with property rights and interests). The result is a welter of seemingly irreconcilable opinions, each seeking to alleviate the tension between the competing values involved. The problem is accentuated because decisions have been rendered over the meandering course of history, and societal concerns given priority by one generation are often considered of less consequence by the next. In resolving the issue before us, we tread upon uncertain and constantly shifting terrain.

Prior to Justice Holmes' opinion in *Pennsylvania Coal Co. v. Mahon*, 260 *U.S.* 393, 43 *S.Ct.* 158, 67 *L.Ed.* 322 (1922), "it was generally thought that the Takings Clause reached only a 'direct appropriation' of property, *Legal Tender Cases*, 12 *Wall.* 457, 551, 20 *L.Ed.* 287 (1871), or the functional equivalent of a 'practical ouster of [the owner's] possession,' *Transportation Co. v. Chicago*, 99 *U.S.* 635, 642, 25 *L.Ed.* 336 (1879)." *Lucas v. South Carolina Coastal Council*, 505 *U.S.* 1003, 1014, 112 *S.Ct.* 2886, 2892, 120 *L.Ed.*2d 798, 812 (1992). Justice Holmes recognized in *Mahon* that if private property were subject to unbridled, uncompensated intrusion under the police power, "the natural tendency of human nature [would be] to extend the qualification more and more until at last private property disappear[ed]." 260 *U.S.* at 415, 43 *S.Ct.* at 160, 67 *L.Ed.* at 326. The principle was thus adopted that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Ibid.* But land use law teems with activity which every day touches the lives of millions, and there is no clear line of demarcation separating overly intrusive regulation that requires just compensation, and mild burdens adjusting the benefits of economic life that do not.

The question of what constitutes a "taking" for purposes of the Fifth Amendment "has proved to be a problem of considerable difficulty." *Penn Central Transp. Co. v. City of New York*, 438

*U.S.* 104, 123, 98 *S.Ct.* 2646, 2659, 57 *L.Ed.*2d 631, 648 (1978). The Supreme Court "has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government. . . ." *Ibid.* (citing *Goldblatt v. Town of Hempstead,* 369 *U.S.* 590, 594, 82 *S.Ct.* 987, 990, 8 *L.Ed.*2d 130, 133–34 (1962)).

In determining an appropriate analytical framework, we look first to the intendment of the "takings" clause. The purpose of this clause is "not to limit the governmental interference with property rights per se, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 *U.S.* 304, 315, 107 *S.Ct.* 2378, 2385–86, 96 *L.Ed.*2d 250, 264 (1987). Government action that works a taking implicates a "constitutional obligation to pay just compensation" to the property's owner. *Armstrong v. United States,* 364 *U.S.* 40, 49, 80 *S.Ct.* 1563, 1569, 4 *L.Ed.*2d 1554, 1561 (1960). Government may not compel a property owner alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. *Ibid.* But much, if not all, land use regulation adjusts the benefits and burdens of property ownership. *Penn Central Transp. Co. v. City of New York,* 438 *U.S.* at 124, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648. "Government hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 *U.S.* at 413, 43 *S.Ct.* at 160, 67 *L.Ed.* at 325. Even in cases where the land use regulation causes some diminution in the value of an owner's property, the legislation "secures an 'average reciprocity of advantage' to everyone concerned," and government is under no obligation to pay compensation for the resulting reduction. *Lucas v. South Carolina Coastal Council,* 505 *U.S.* at 1018, 112 *S.Ct.* at 2894, 120 *L.Ed.*2d at 814 (quoting *Pennsylvania Coal Co. v. Mahon,* 260 *U.S.* at 415, 43 *S.Ct.* at 160, 67 *L.Ed.* at 326); *see Agins v. City of Tiburon,* 447 *U.S.* 255, 262, 100 *S.Ct.* 2138, 2142, 65 *L.Ed.*2d 106, 113 (1980).

However, the functional basis for permitting government, by regulation, to affect property values without compensation "does not apply to the relatively rare situations where [the state] has deprived a landowner of all economically beneficial uses." *Lucas v. South Carolina Coastal Council,* 505 *U.S.* at 1018, 112 *S.Ct.* at 2894, 120 *L.Ed.*2d at 814. In such cases, the effect of the regulation may be likened to a direct invasion of the property or the practical ouster of the owner's possession. Thus, where government enacts legislation or adopts a regulation that denies an owner substantially all economic use of his or her land, a taking has occurred and the property owner must be compensated. *Id.* at 1028–29, 112 *S.Ct.* at 2900, 120 *L.Ed.*2d at 820–21; *see also Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 *U.S.* 264, 297 n. 40, 101 *S.Ct.* 2352, 2371 n. 40, 69 *L.Ed.*2d 1, 29 n. 40 (1981); *Agins v. City of Tiburon,* 447 *U.S.* at 262, 100 *S.Ct.* at 2142, 65 *L.Ed.*2d at 113.

In order to determine what was "taken" by the force of a statute or regulation, one must know what the property owner had originally. Stated differently, the antecedent inquiry into the nature of the owner's estate accords with our "takings" jurisprudence "which has traditionally been guided by the understandings of our citizens regarding the content of . . . the 'bundle of rights' that they acquire when they obtain title to property." *Lucas v. South Carolina Coastal Council,* 505 *U.S.* at 1027, 112 *S.Ct.* at 2899, 120 *L.Ed.*2d at 820. This inquiry raises the issue that cases and legal commentators have described as the problem of defining the "denominator." In *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 *U.S.* 470, 497, 107 *S.Ct.* 1232, 1248, 94 *L.Ed.*2d 472, 496 (1987), the Supreme Court explained that "[b]ecause our test for regulatory taking requires [comparison of] the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction.'" (quoting Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just*

*Compensation" Law*, 80 *Harv. L.Rev.* 1165, 1192 (1967)). We will return to this subject later in our opinion. But here, we are concerned with the broader concept of property ownership—the sticks that make up the "bundle of rights" acquired by the owner when property is conveyed to him. In determining the effect of a statute or regulation on an owner's property rights, we look to whether the regulatory action interferes with the owner's "distinct investment-backed expectations" and to what extent such expectations were reasonable. *Penn Central Transp. Co. v. City of New York*, 438 *U.S.* at 124, 125, 98 *S.Ct.* at 2659, 57 *L.Ed.*2d at 648. We also look to whether the economic "right" allegedly destroyed by the regulation was vested in the owner or within the power of the State to regulate under the common law nuisance doctrine. *See Lucas v. South Carolina Coastal Council*, 505 *U.S.* at 1029, 112 *S.Ct.* at 2900, 120 *L.Ed.*2d at 821.

To recapitulate, in determining whether an owner's property has been "taken," we are to consider: (1) whether the regulation has deprived the owner of virtually all economically viable uses of the property, (2) whether the property owner had any distinct investment-backed expectations at the time of acquiring the property that were destroyed by the force of the regulation, and (3) whether the interest claimed to have been "taken" was vested with the owner, as a matter of state property law, and not within the power of the State to regulate under common law nuisance. Here, the DEP does not claim that the proposed use of the riparian land, erection of a dock, constitutes a common law nuisance that may be proscribed by the State. Thus, our inquiry focuses on the first two factors.

### A.

We first consider the economic impact of the denial of the development permit. As stated above, the mere diminution of land value itself does not constitute a taking. *Gardner v. New Jersey Pinelands Comm'n*, 125 *N.J.* at 210, 593 *A.*2d 251. Likewise, impairment of the marketability of land alone does not effect

a taking. *Ibid.* Also, restrictions on uses do not necessarily result in takings even though they reduce income or profits. *Ibid.; see also Southern Burlington County NAACP v. Township of Mount Laurel,* 92 *N.J.* 158, 273 and n. 34, 456 *A.*2d 390 (1983). A regulatory scheme will be upheld against a claim of inverse condemnation "unless it denies 'all practical use' of property, or 'substantially destroys the beneficial use of private property,' or does not allow an 'adequate' or 'just and reasonable' return on investment." *Gardner v. New Jersey Pinelands Comm'n,* 125 *N.J.* at 211, 593 *A.*2d 251 (citations omitted). "[O]ur courts have applied the standard that focuses on the beneficial or economic uses allowed to a property in the context of particularized restraints designed to preserve the special status of distinctive property and sensitive environmental regions." *Ibid.* (citing *In re Egg Harbor Assocs.,* 94 *N.J.* 358, 464 *A.*2d 1115 (1983); *Spiegle v. Borough of Beach Haven,* 46 *N.J.* 479, 218 *A.*2d 129, *cert. denied,* 385 *U.S.* 831, 87 *S.Ct.* 63, 17 *L.Ed.*2d 64 (1966); *Orleans Builders & Developers v. Byrne,* 186 *N.J.Super.* 432, 453 *A.*2d 200 (App.Div. 1982); *In re Loveladies Harbor, Inc.,* 176 *N.J.Super.* 69, 422 *A.*2d 107 (App.Div.1980), *certif. denied,* 85 *N.J.* 501, 427 *A.*2d 588 (1981); *New Jersey Builders Ass'n v. Department of Envtl. Protection,* 169 *N.J.Super.* 76, 404 *A.*2d 320 (App.Div.), *certif. denied,* 81 *N.J.* 402, 408 *A.*2d 796 (1979); *Toms River Affiliates v. Department of Envtl. Protection,* 140 *N.J.Super.* 135, 355 *A.*2d 679 (App.Div.), *certif. denied,* 71 *N.J.* 345, 364 *A.*2d 1077 (1976); *Sands Point Harbor, Inc. v. Sullivan,* 136 *N.J.Super.* 436, 346 *A.*2d 612 (App. Div.1975)).

Classification of the tide-flowed land as a "special restricted area" with the consequent denial of a development permit clearly destroys the only beneficial use of plaintiffs' riparian land. The terms of the riparian grant are clear—"[the] land . . . is not to be used for any purpose whatsoever except the erection of a pier. . . ." The effect of the regulatory scheme, therefore, is to sacrifice all economically beneficial uses in the riparian grant in the name of the common good. Were we to consider the riparian grant alone as the property interest against which the loss of value

is to be measured, we would be obliged to sustain plaintiffs' claim of inverse condemnation because the effect of the regulation is to compel the property owners to leave the tide-flowed land entirely idle. Conversely, were we to consider the upland and riparian parcels as a single unit of property against which the loss of value is to be measured, we would be required to reject plaintiffs' claim of inverse condemnation because the effect of the regulation is merely to destroy a somewhat minor "strand" or "stick" in plaintiffs' overall bundle of rights. *See Andrus v. Allard*, 444 *U.S.* 51, 65–66, 100 *S.Ct.* 318, 327, 62 *L.Ed.2d* 210, 222–23 (1979). We are thus faced with the "denominator" problem to which we alluded earlier. More specifically, the critical question is "how to define the unit of property 'whose value is to furnish the denominator of the fraction.' " *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 *U.S.* at 497, 107 *S.Ct.* at 1248, 94 *L.Ed.2d* at 496.

The question has received somewhat uneven treatment in our reported opinions. In *Morris County Land Improvement Co. v. Township of Parsippany–Troy Hills*, 40 *N.J.* 539, 542, 193 *A.2d* 232 (1963), the plaintiff owned a large tract of land. The undeveloped wetlands portion was located in Parsippany–Troy Hills, and the adjoining developed land was located in neighboring Hanover. *Ibid.* The portion of the plaintiff's property in Parsippany–Troy Hills was subject to a zoning classification which precluded any viable use of the wetlands property. *Id.* at 543–44, 193 *A.2d* 232. The Court held that this zoning scheme, if unmodified, would constitute a taking of private property requiring fair compensation. *Id.* at 554–57, 193 *A.2d* 232. In reaching this conclusion, the Court clearly assumed that the property unit against which the loss was to be measured was only the undeveloped land situated in Parsippany–Troy Hills. The Court neither considered nor discussed the larger adjoining property located in Hanover. Subsequent decisions have questioned whether *Morris County Land Improvement Co.* remains good law in all respects. *See Gardner v. New Jersey Pinelands Comm'n*, 125 *N.J.* at 213–14, 593 *A.2d* 251; *AMG Assocs. v. Township of Springfield*, 65 *N.J.* 101, 112 n. 4, 319 *A.2d* 705 (1974).

Without alluding to the "denominator" problem in *American Dredging Co. v. Department of Environmental Protection,* 169 *N.J.Super.* 18, 404 *A.*2d 42 (App.Div.1979), and *In re Loveladies Harbor, Inc.,* 176 *N.J.Super.* 69, 422 *A.*2d 107, we assumed, without discussion of the question, that the fractional denominator should include all of the contiguous acreage under a single ownership. We last discussed this issue in *East Cape May Associates v. Department of Environmental Protection,* 300 *N.J.Super.* 325, 693 *A.*2d 114 (App.Div.1997). Writing for the court, Judge Brochin analyzed the relatively few decisions that have considered the subject, characterizing the present law as largely "unsettled." *Id.* at 353, 693 *A.*2d 114. Because the record was inadequate, we reached no conclusions, but instead remanded the matter for further development of the facts. *Ibid.* In the course of our opinion, we posed a lengthy list of questions noting that the answers might be helpful in "the formulation of [a] rule" to determine the property unit against which the owner's loss could be measured. *Id.* at 354, 693 *A.*2d 114. Most of these questions were fact-specific to East Cape May's claim of inverse condemnation. Suffice it to say that the information we sought pertained to the history of the ownership and development of the property.

This was in accord with the decisions of other jurisdictions which have generally considered the composition of the denominator of the taking fraction as consisting of all of the claimant's contiguous acreage in the same ownership. *See, e.g., Jentgen v. United States,* 228 *Ct.Cl.* 527, 657 *F.*2d 1210 (1981), *cert. denied,* 455 *U.S.* 1017, 102 *S.Ct.* 1711, 72 *L.Ed.*2d 134 (1982); *Deltona Corp. v. United States,* 228 *Ct.Cl.* 476, 657 *F.*2d 1184 (1981), *cert. denied,* 455 *U.S.* 1017, 102 *S.Ct.* 1712, 72 *L.Ed.*2d 135 (1982); *Zealy v. City of Waukesha,* 201 *Wis.*2d 365, 548 *N.W.*2d 528 (1996). This is not the universal rule. Several decisions have held that the denominator of the taking fraction is the portion of the property subject to the confiscating regulation. *See, e.g., Loveladies Harbor, Inc. v. United States,* 28 *F.*3d 1171 (Fed.Cir.1994); *Florida Rock Indus., Inc. v. United States,* 18 *F.*3d 1560 (Fed.Cir. 1994), *cert. denied,* 513 *U.S.* 1109, 115 *S.Ct.* 898, 130 *L.Ed.*2d 783

(1995); *K & K Constr., Inc. v. Department of Natural Resources,* 217 *Mich.App.* 56, 551 *N.W.*2d 413 (Mich.Ct.App.1996), *appeal granted,* —— *Mich.* ——, 562 *N.W.*2d 788 (1997); *Volkema v. Department of Natural Resources,* 214 *Mich.App.* 66, 542 *N.W.*2d 282 (Mich.Ct.App.1995), *appeal held in abeyance,* —— *Mich.* ——, 562 *N.W.*2d 789 (1997). However, these cases involved large tracts of acreage that had been segmented into smaller parcels for development at different times, and either because of the configuration of the property or its history, the divided parcels had been considered as separate and distinct entities or units. Applying a "flexible approach, designed to account for such factual nuances," *Loveladies Harbor, Inc. v. United States,* 28 *F.*3d at 1181, the respective courts found it logical to treat each parcel separately for determining whether the particular regulation affected a "taking" requiring just compensation. *See Quirk v. Town of Boston,* 140 *N.H.* 124, 130–31, 663 *A.*2d 1328, 1332–33 (1995).

■ Recognizing the fact-sensitive question before us, we are convinced that the adjoining upland and riparian lands must be considered a single property unit. As we noted earlier, the riparian grant requires that the uplands and tide-flowed property be commonly owned. Indeed, the riparian grant was contingent upon common ownership and was to be "voided" or forfeited if the contingency was not satisfied. Moreover, the right permitted under the riparian grant, the erection of a dock, was a mere incident to use of the upland property. So too, as the Schweinert tract was subdivided over the years, the upland and riparian properties were always bought and sold as a single unit. Plaintiffs purchased both properties in a single contract of sale, and sold the land to the present owners as a single unit. Finally, the properties are assessed for tax purposes as a single lot. In both law and fact, the properties are inextricably intertwined. We, thus, conclude that the Chancery Division erred when it considered the riparian land as a separate parcel, wholly distinct from the uplands portion.

· Viewing the uplands and tide-flowed lands as a single property, it is apparent that denial of the development permit did not effect a taking. While plaintiffs contend that the riparian grant should be considered separate and distinct, they concede that no taking occurred, if the upland and tide-flowed lands are considered the "property unit" upon which the effect of the regulation is to be measured.

## B.

For the sake of completeness, we next consider whether plaintiffs had a reasonable investment-backed expectation that was destroyed by the denial of the development permit. Whether or not the property owner's expectations are reasonable "depend to a significant extent on whether [he] had notice in advance of [his] investment decision that the governmental regulations ... had been or would be enacted." *East Cape May Assocs. v. Department of Envtl. Protection,* 300 *N.J.Super.* at 337, 693 *A.2d* 114.

We first consider the nature of the property that was the subject of the riparian grant. Under the public trust doctrine, "ownership of and dominion and sovereignty over lands covered by tide waters ... belong to the respective states within which they are found...." *Illinois Central R.R. Co. v. Illinois,* 146 *U.S.* 387, 435, 13 *S.Ct.* 110, 111, 36 *L.Ed.* 1018, 1036 (1892). Although the states have the inherent authority to convey riparian grants to private persons, *see Borough of Neptune City v. Borough of Avon–by–the–Sea,* 61 *N.J.* 296, 303–05, 294 *A.2d* 47 (1972), the sovereign never waives its right to regulate the use of public trust property. *Illinois Central R.R. Co. v. Illinois,* 146 *U.S.* at 453, 13 *S.Ct.* at 118, 36 *L.Ed.* at 1042; *see also Contributors to Pennsylvania Hosp. v. City of Philadelphia,* 245 *U.S.* 20, 38 *S.Ct.* 35, 62 *L.Ed.* 124 (1917).

It is thus plain that the 1924 riparian grant from the State to the Schweinerts did not create an absolute and perpetual right to construct a dock, free from all legislative and regulatory

intervention. Indeed, as we pointed out earlier, the Waterfront Development Act was in place at the time the Schweinerts acquired the riparian grant. Although the focus of the regulatory scheme adopted under the Act shifted from development to preservation, the State plainly had "reserve powers" to alter or change the law, even after making the covenant with the Schweinerts. *See A.P. Smith Mfg. Co. v. Barlow*, 26 *N.J.Super.* 106, 123–24, 97 *A*.2d 186 (Ch.Div.), *aff'd*, 13 *N.J.* 145, 98 *A*.2d 581 (1953). And clearly, the State's emerging policy with respect to shellfish protection fell within its police powers under the public trust doctrine. *See In re Loveladies Harbor, Inc.*, 176 *N.J.Super.* at 77, 422 *A*.2d 107.

We stress that the prohibition against the erection of docks along the Manasquan River was a matter of public record long before plaintiffs purchased the property. The prohibition was expressly set forth in a published regulation. Specifically, *N.J.A.C.* 7:12–2.1(a)(5) and *N.J.A.C.* 7:12–3.2(a) denominate the area in which plaintiffs' property is situated as a "special restricted area." *N.J.A.C.* 7:7E–3.2(d) proscribes the construction of a dock in waters so classified.

Beyond this, the DEP's regulations provide a pre-application review process under which parties can obtain an initial determination even before applying for a development permit. *See N.J.A.C.* 7:7–3. Plaintiffs never availed themselves of this right.

The crucial fact is that since the early 1970's the regulatory jurisdiction of the DEP has substantially expanded and the substantive criteria necessary for granting a development permit has significantly stiffened. The decision to shift public policy from commerce to environmental protection and wildlife preservation was not made by a faceless bureaucrat somewhere within the administrative labyrinth of a nameless office building in Trenton. Instead, it was articulated by our Legislature in carefully crafted enactments and heralded by the Governor with great fanfare. Plaintiffs must be held to have had constructive notice of these developments.

■ We recognize that rights in property pass from one owner to the next. Thus, the right of a property owner to fair compensation when his property is zoned into inutility by changes in the zoning law passes to the next owner despite the latter's knowledge of the impediment to development. *See Urban v. Planning Board of Manasquan,* 124 *N.J.* 651, 592 *A.*2d 240 (1991); *Moroney v. Mayor and Council of Old Tappan,* 268 *N.J.Super.* 458, 633 *A.*2d 1045 (App.Div.1993), *certif. denied,* 136 *N.J.* 295, 642 *A.*2d 1004 (1994). But plaintiffs' predecessors in title, the Schweinerts, never had the absolute right to construct a dock; it was always conditioned on the requirement of obtaining a development permit. While the conditions for obtaining a development permit have undoubtedly become more onerous in the seventy-odd years that have passed since the riparian grant was issued, plaintiffs could not have reasonably expected that they would be immune from all changes in the law during that period.

We are thus convinced that the Chancery Division erred by granting partial summary judgment. We thus reverse the judgment and remand the matter to the Chancery Division.

WEFING, J.A.D., concurring.

I concur in the result reached by my colleagues and fully subscribe to their view that "the adjoining upland and riparian lands must be considered a single property unit" and that "[i]n both law and fact, the properties are inextricably intertwined." (Op. at 239). At the oral argument of this matter, both parties agreed that our resolution of that single issue would be dispositive. I share that assessment and thus find it unnecessary to consider the additional question of whether plaintiffs had a reasonable investment-backed expectation that was destroyed by the refusal of the DEP to issue a permit for the construction of a dock or pier.