44 A.3d 626 (2012)
426 N.J. Super. 337
STATE of New Jersey, by the COMMISSIONER OF TRANSPORTATION, Plaintiff-Appellant,
v.
MARLTON PLAZA ASSOCIATES, L.P., a Delaware Limited Partnership; and Marlton Plaza Associates II, L.P., a Delaware Limited Partnership, Defendants-Respondents, and
Bank of America, National Association, successor to Bank of New England, National Association, by various mergers and name changes; Freedman and Lorry Retirement Plan, Freedman and Lorry P.C. Retirement Plan, Components Corporation of America Pension Trust; John Hancock Life Insurance Company (U.S.A.), successor to The Manufacturers Life Insurance Company (U.S.A.), successor to The Manufacturers Life Insurance Company; Lasalle Bank, N.A., as Trustee for Bear Stearns Commercial Securities, Inc.; Wells Fargo Bank, N.A., as Trustee for the benefit of the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corporation, Commercial Mortgage Pass-Through Certificates, Series 2006-LDP6; Marlton Crossing Maintenance Association, a New Jersey Non-Profit Organization; The TJX Companies, Inc., a Delaware Corporation doing business as T.J. Maxx; Carter's Retail, Inc., a Delaware Corporation, doing business as Carter's; Household Finance Corporation III, a Delaware Corporation; Lee Tsuy, doing business as Oriental Nail Salon; Supercuts, Inc., a Delaware Corporation, doing business as Supercuts; HomeGoods, Inc., a Delaware Corporation, doing business as HomeGoods; Tween Brands, Inc., a Delaware Corporation, doing business as Justice for Girls; Cosmetic Gallery, Inc., a New Jersey Corporation, doing business as Image Cosmetics; Burlington Coat Factory Warehouse of Montville, Inc., a New Jersey Corporation; Five Below, Inc., a Pennsylvania Corporation, doing business as Five Below; Difillippo X, Inc., a New Jersey Corporation, doing business as Saladworks; Blink Hair/Face/Body Inc., a New Jersey Corporation, doing business as Blink Spa; The Spaghetti House, Inc., a New Jersey Corporation, doing business as The Spaghetti House; TD Ameritrade, Inc., a New York Corporation, doing business as TD Waterhouse; PRG Group, Inc., a New Jersey Corporation, doing business as Fleet Feet of Marlton; Andreas Boutique, Inc., a New Jersey Corporation, doing business as Andrea's Boutique; Bob Timmins, doing business as Great Wraps; Donna's Bag, Inc., a New Jersey Corporation, doing business as Donna's Bag; Marlton Crossing Fitness, a New Jersey Limited Liability Company, doing business as Smart Bodies; The Little Gym International Inc., a Delaware Corporation, doing business as The Little Gym of Marlton; Giadon Corporation, a New Jersey Corporation, doing business as Scruples Hair Salon; Dish It Out Ltd., a New Jersey Corporation, doing business as Dish It Out; South Jersey Tanning and Spa, L.L.C., a New Jersey Limited Liability Company, doing business as Planet Beach Tanning Salon; Palz Foods, Inc., a New Jersey Corporation, doing business as Food for Thought; Circle Center Cleaners, a New Jersey Limited *627 Liability Company; Scrubs & Beyond, L.L.C., a Delaware Limited Liability Company, doing business as Scrubs & Beyond; Guitar Center Stores, Inc., a Delaware Corporation, doing business as Music & Arts; Dana's Hallmark; Joe's Peking Duck House, Inc., a New Jersey Corporation; Noppakao of Marlton, Inc., a New Jersey Corporation, doing business as Thai Taste; Claudia Hughes, doing business as Smoothie King; Joyce Leslie, Inc.; Jay Madi, Inc., a New Jersey Corporation, doing business as Quizno's Subs; Pearle Vision, Inc., a Delaware Corporation; The Playing Field Too, a New Jersey Limited Liability Company, doing business as The Playing Field; Kaplan Educational Centers, Inc., a Delaware Corporation, doing business as Kaplan Learning Center; Jenny Craig Weight Lost Centre's, Inc., a Delaware Corporation; DSW Shoe Warehouse, Inc., a Missouri Corporation; Carryl Slobotkin, doing business as Jazz Unlimited Dance Studio; Champps of Marlton, Inc., a New Jersey Corporation, doing business as Champps American Restaurant; and Township of Evesham, in the County of Burlington, a Municipal Corporation of New Jersey, Defendants.
No. A-2164-10T4.
Superior Court of New Jersey, Appellate Division.
Argued February 14, 2012.
Decided June 8, 2012.
*628 David R. Patterson, Deputy Attorney General, argued the cause for appellant *629 (Jeffrey S. Chiesa, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Nonee Lee Wagner, Deputy Attorney General, on the brief).
David B. Snyder argued the cause for respondents (Fox Rothschild LLP, Atlantic City, attorneys; Mr. Snyder, of counsel and on the brief).
Jamie M. Bennett argued the cause for amicus curiae New Jersey Coalition of Automotive Retailers, Inc. (Wilentz, Goldman & Spitzer, attorneys; Marvin Brauth, Woodbridge, of counsel and on the brief; Ms. Bennett, on the brief).
Drew K. Kapur argued the cause for amicus curiae Maple Shade Properties, LLC (Duane Morris LLP, attorneys; Mr. Kapur, of counsel and on the brief; Michael J. McCalley, on the brief).
Before Judges PARRILLO, SKILLMAN and HOFFMAN.
The opinion of the court was delivered by
PARRILLO, P.J.A.D.
At issue is the scope of damages awardable to condemnees at a just compensation trial where a highway improvement project involves both a modification of access and a condemnation.
Pursuant to its authority under the State Highway Access Management Act, N.J.S.A. 27:7-89 to -98 (Access Act), the New Jersey Department of Transportation (DOT) closed one of several access driveways leading into defendants' shopping center. Later, in an eminent domain proceeding, it condemned a small strip of land, a slope easement, and a temporary work area within the shopping center in the vicinity of the former driveway.
At the just compensation trial, defendants claimed that they were entitled to damages not only for the value of the condemned land and easements, but also for losses in property value allegedly caused by the closure of the access driveway. The trial court agreed and allowed defendants to present expert testimony concerning internal traffic congestion that would result from the driveway closure and the impact of such congestion on the shopping center's value. The jury accepted this testimony, at least in part, as it awarded defendants considerably more compensation than a taking of the land and easements alone would warrant.
The State now appeals the order for judgment and fixing just compensation at $1,607,000. For reasons that follow, we reverse and remand for a new trial.
Due to congestion in the area, in 2001 DOT moved forward with the Marlton Circle Project, which would eliminate the traffic circle created by the confluence of Routes 70 and 73 in Evesham Township and replace it with a flyover so that Route 73 would cross Route 70 on an overpass. The project affected the roadways around defendants' property, the thirty-two acre Marlton Crossing Shopping Center (Center).
The Center lies on two irregularly-shaped parcels of land, close to where Route 73 crosses Route 70. The north parcel consists of 16.8 acres with 956 feet of frontage along Route 73. The south parcel consists of 15.3 acres, with 786 feet of frontage along Route 73. An internal connector road lies between the two parcels.
The Center originally had three access driveways that provided ingress and egress onto Route 73: the northern driveway, the central driveway leading to the connector road, and the southern driveway. The Center could also be accessed *630 through driveways on Old Marlton Pike, Lippincott Drive, and Centre Boulevard.
Construction of the new overpass/underpass interchange required that a traffic ramp be built directly in front of the north parcel. Because the northern-most of the Center's three access driveways on Route 73 would intersect Route 73 at the point where cars were merging from the traffic ramp, DOT determined to close that driveway[1] and notified defendants of the proposed closing sometime in the Fall of 2003.
Defendants submitted a counter-proposal, which DOT incorporated into a new access modification plan. When defendants objected to the modified plan, a meeting was held between defendants and representatives of DOT. As the result of that meeting, defendants submitted a second counter-proposal that included the closure of the northern driveway. This counter-proposal was discussed at a second meeting with representatives of DOT on April 6, 2005. At that time, DOT agreed to defendants' alternate proposal and also agreed to make parking lot improvements necessary to remediate the closure. Revised plans reflecting the agreed-upon modifications were completed on April 11, 2005, and copies were sent to defendants' consultant. Defendants did not appeal from, or seek further DOT review of, the access modification determination depicted in those plans, see N.J.A.C. 16:47-4.33, which ultimately became part of the final construction package. Consequently, as part of the construction project, the State removed the driveway, replaced it with new curbing and pavement and striped the pavement for parking spaces.
In order to construct the new interchange, the State condemned a small strip of land (.23 acres or 10,021 square feet) along the Center's frontage on Route 73. It also condemned a slope easement (.179 acres or 7,807 square feet) so that it could level the grade between the parking lot and the traffic ramp. Finally, it condemned a temporary work easement so that it could make the improvements necessitated by the removal of the driveway. Interestingly, due to a straightening of the property line, the takings actually increased the Center's road frontage on Route 73 from 1,731 feet to 1,748 feet.
On August 25, 2006, DOT formally offered defendants $179,600 for the land taken in fee and slope easement. One year later, on August 23, 2007, the State filed a complaint in condemnation against defendants, and on September 13, 2007, a declaration of taking of the land and premises described in the condemnation complaint. The estimated just compensation of $179,600 was deposited with the Clerk of the Superior Court.
On December 10, 2007, a Law Division judge entered an order finding that the State had duly exercised its power of eminent domain. Accordingly, the court appointed commissioners, who thereafter fixed the compensation to be paid defendants at $218,300. Both the State and defendants appealed from the commissioners' report.
Prior to jury trial, the State moved in limine to preclude testimony of defense witnesses concerning any diminution in property value resulting from the driveway closure. The judge denied the motion, finding that defendants were entitled to present their damage claims to the jury, reasoning that "the taking of the access, even if it's under the police power, went hand in hand with the condemnation of the property.... This happened part [and] parcel of the same proceeding."
*631 At trial, Craig Black, a real estate appraiser retained by the State, valued the condemned property and easements as of August 24, 2007, based on a comparable sales analysis, at $160,300 for the land taken; $31,228 for the easement; and a nominal $1,000 for the temporary work area easement, for a total value of $194,428.[2] Black did not consider any impact the access modification would have on the Center, stating that he did not believe that the taking had any effect on the remainder of the property.
Defendants' real estate appraiser, William Steinhart, reached a similar conclusion as to the value of the land taken in fee and slope easement. He disagreed, however, as to the value of the temporary work area easement, concluding that it should be valued at $250,000a figure derived from 25% of the Center's total rental income for a two-month period. His appraisal also differed from Black's in that Steinhart considered the effect that changed internal traffic circulation had on the remainder of the Center.
David Shropshire, a traffic engineering consultant retained by defendants, testified that the closure of the northern driveway would have a critical impact on internal traffic circulation. His opinion was based on his pre-closure measurement of traffic flow at intersections within the Center, rather than traffic circulation post-closure. In this regard, he made certain assumptions concerning how traffic would be redistributed and concluded that there would be significant delays at an internal intersection on the connector road at peak hours, which would compromise internal traffic circulation in terms of safety and service.
Steinhart also believed that shopper dissatisfaction with decreased maneuverability within the Center could manifest itself as a decrease in rent, an increase in vacancy rates, or additional investment risk. Using an income approach to value, he estimated that the total damages caused by the takings and by the changes in internal traffic circulation amounted to $2,250,000.
The State presented rebuttal testimony from Jay Etzel, a traffic engineer who disagreed with Shropshire's analysis, taking issue with two assumptions the expert made concerning post-closure conditions. Specifically, Etzel opined that Shropshire erred by assuming 1) that 100% of the traffic that formerly used the northern driveway would divert to the central driveway and 2) that the peak hour factor Shropshire calculated from pre-closure field data would remain unchanged post-closure, despite increased traffic volume. Using a peak hour factor derived from professionally established values and assuming that at least some vehicles would avoid the central driveway if it were congested, Etzel concluded that the internal intersection in question would provide a satisfactory level of service even at peak volumes. Further, Etzel noted that new signals and routing options that had been established around the Center cast doubt on conclusions based entirely on pre-closure data.
In its jury charge, the court instructed the jury that
[i]t is up to you to determine the existence and amount by which the value of the remaining property was reduced or diminished as a result of onsite conditions created by the taking and you will consider such factors, if any, in arriving *632 at your value of the property after the taking and ultimately in your award of compensation.
The court explained that a property owner is not entitled to compensation for diminution of access per se, but the owner can recover "[i]f as a result of a change in access there is a real or genuine affect [sic] on the property because of onsite damages such as effects on internal traffic maneuverability."
Following a seven-day trial, the jury returned a unanimous verdict setting the compensation owed defendants at $1,607,000. Thereafter the court entered final judgment in that amount plus interest.
On appeal, the State argues that the court erred by conflating DOT's authority to regulate highway access with its power to condemn private property through eminent domain and that defendants' redress for the driveway closure was limited to the procedures set forth in the Access Act. Because the court mistakenly allowed defendants to present evidence of diminished value due to altered internal traffic circulation, the State maintains that the jury verdict should be vacated and the matter remanded for a new just compensation trial.
Consideration of the State's claims of error in the trial court's evidentiary ruling and jury charge calls for de novo review. Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378, 658 A.2d 1230 (1995); see also Dempsey v. Alston, 405 N.J.Super. 499, 509, 966 A.2d 1 (App.Div.) (holding that when trial court's decision turns on question of law, appellate review is de novo), certif. denied, 199 N.J. 518, 973 A.2d 386 (2009); State v. Russo, 333 N.J.Super. 119, 135, 754 A.2d 623 (App.Div.2000) (observing that trial court's legal conclusions not entitled to same deference as factual findings). Specifically, the question to be resolved presents a purely legal issue, namely, whether proof of value lost due to access modifications imposed in accordance with the Access Act can be considered in arriving at a just compensation award in a condemnation proceeding.

I
In essence, the State argues that regulation of access is an administrative process unrelated to condemnation, and that as an exercise of the State's police power, access regulation is non-compensable as long as any value remains in the affected property. Because the present matter involves the intersection of these two procedures, we must review both the relevant provisions of the Access Act and the law as to regulatory takings of private property.

A.
The New Jersey Legislature recognized that the State has a responsibility to effectively manage and maintain each highway within the State highway system and that unrestricted access to State highways can impair the purpose of that system. N.J.S.A. 27:7-90(c), (d). Although every owner of property that abuts a public road has a right of reasonable access to the road, that right is subject to regulation for the purpose of protecting the public health, safety and welfare. N.J.S.A. 27:7-90(e). Governmental entities through regulation may not, however, eliminate all access to the general system of highways without providing just compensation. N.J.S.A. 27:7-90(f).
After the DOT Commissioner determines that alternate access is available, a property owner's access permit may be modified or revoked upon written notice and hearing. N.J.S.A. 27:7-94(a). Alternate access is assumed to exist if the property *633 owner enjoys reasonable access to the general system of streets and highways, and in the case of a commercial property owner, if access is available onto "any parallel or perpendicular street, highway, easement, service road or common driveway, which is of sufficient design to support commercial traffic to the business or use." N.J.S.A. 27:7-94(c)(1).
Pursuant to N.J.S.A. 27:7-94(d):
When the commissioner revokes an access permit pursuant to this section, the commissioner shall be responsible for providing all necessary assistance to the property owner in establishing the alternative access, which shall include the funding of any such improvements by the department. Until the alternative access is completed and available for use, the permit shall not be revoked....
As provided in this subsection, necessary assistance shall include but not be limited to the costs and expenses of relocation and removal associated with engineering, installation of access drives in a new location or locations, removal of old drives, on-site circulation improvements to accommodate changes in access drives, landscaping, replacement of directional and identifying signages and the cost of any lands, or any rights or interests in lands, and any other right required to accomplish the relocation or removal.
When reasonable alternative access is not available, the commissioner may acquire by condemnation any right of access to "any highway upon a determination that the public health, safety and welfare require it." N.J.S.A. 27:7-98.
As directed by N.J.S.A. 27:7-91, DOT adopted the State Highway Access Management Code, N.J.A.C. 16:47-1.1 to -9.1 (Access Code). N.J.A.C. 16:47-4.33 sets forth the procedures to be followed when DOT modifies or revokes highway access permits in conjunction with a highway improvement project. See generally, In re Route 206 at New Amwell Rd., 322 N.J.Super. 345, 356-57, 731 A.2d 56 (App. Div.) (discussing the procedural requirements of N.J.A.C. 16:47-4.33), certif. denied, 162 N.J. 197, 743 A.2d 849 (1999).
In the case of modification,[3] DOT must notify each lot owner in writing of a proposed access modification and provide the lot owner with a plan showing the modification prior to beginning construction. N.J.A.C. 16:47-4.33(c)(2). The lot owner must respond to DOT in writing within thirty days of receipt of notice, either accepting the modification plan or appealing it. N.J.A.C. 16:47-4.33(c)(4).
If the lot owner appeals, the Manager of the Bureau of Major Access Permits must schedule an informal meeting with the lot owner to resolve any differences. N.J.A.C. 16:47-4.33(c)(5). The Manager must issue a decision in writing within thirty days of the meeting. Ibid. If the lot owner does not agree with the decision, he or she may submit an appeal to the Director, Division of Design Services, within thirty days. Ibid.
The Director must schedule an informal hearing within ten days of receipt of the appeal, where the lot owner will have an opportunity to present further information regarding objections to the modification plan. N.J.A.C. 16:47-4.33(c)(6). The Director *634 must render a final agency decision, with reasons, within thirty days of the informal hearing and notify the lot owner of the decision in writing. N.J.A.C. 16:47-4.33(c)(7). The lot owner may appeal the final agency decision to the Appellate Division as of right within forty-five days from the date of service of the decision. R. 2:2-3(a)(2); R. 2:4-1(b).[4]
Here, DOT was clearly authorized by N.J.S.A. 27:7-90 to modify or revoke defendants' access permit for the northern driveway. It served notice on defendants of its plan in accordance with N.J.A.C. 16:47-4.33. Defendants did not appeal the proposal, but rather opted to negotiate a more favorable plan, to which they ultimately consented. The meetings that took place with project management staff were not the meetings contemplated by N.J.A.C. 16:47-4.33(c)(5). Because defendants never formally appealed the access determination, neither the Manager of the Bureau of Major Access Permits nor the Director, Division of Design Services had occasion to consider defendants' objections or address the question of whether the access that remained after the closure was reasonable. Because defendants consented to DOT's plan, that plan became the final agency determination.

B.
It remains to determine whether the modification of highway access at issue here amounted to a regulatory taking for which compensation is due defendants.
"When the state regulates lands to... provide for the general welfare of its citizens there are inevitably consequences that affect the rights of property owners." Mansoldo v. State, 187 N.J. 50, 53, 898 A.2d 1018 (2006).
The Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, provides that property shall not "be taken for public use, without just compensation." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 536, 125 S.Ct. 2074, 2080, 161 L.Ed.2d 876, 886 (2005). The New Jersey Constitution, article I, paragraph 20, and article IV, section 6, paragraph 3, likewise provide protections against governmental takings of private property without just compensation. Klumpp v. Borough of Avalon, 202 N.J. 390, 404-05, 997 A.2d 967 (2010). The State constitutional protections have been found to be coextensive with the federal Takings Clause. Id. at 405, 997 A.2d 967; OFP, L.L.C. v. State, 395 N.J.Super. 571, 581, 930 A.2d 442 (App.Div.2007), aff'd, 197 N.J. 418, 963 A.2d 810 (2008).
While early jurisprudence interpreted the Takings Clause as reaching only a direct appropriation of property, Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 2892, 120 L.Ed.2d 798, 812 (1992), evolving case law recognized that "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ousterand that such `regulatory takings' may be compensable under the Fifth Amendment." Lingle, supra, 544 U.S. at 537, 125 S.Ct. at 2081, 161 L.Ed.2d at 887 (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)); accord Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 325, 122 S.Ct. 1465, 1480, 152 L.Ed.2d 517, 542 *635 (2002). As Justice Holmes explained, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Mahon, supra, 260 U.S. at 415, 43 S.Ct. at 160, 67 L.Ed. at 326.
The difficulty, of course, has always been in determining when any given regulation of property goes "too far." Lingle, supra, 544 U.S. at 538, 125 S.Ct. at 2081, 161 L.Ed.2d at 887; Lucas, supra, 505 U.S. at 1015, 112 S.Ct. at 2893, 120 L.Ed.2d at 812. See also Washington Mkt. Enters., Inc. v. City of Trenton, 68 N.J. 107, 116, 343 A.2d 408 (1975) (observing that "[t]he general question as to when governmental action amounts to a taking of property has always presented a vexing and thorny problem"). The United States Supreme Court "has been unable to develop any `set formula' for determining when `justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 123-24, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978); accord Tahoe-Sierra Pres. Council, supra, 535 U.S. at 326, 122 S.Ct. at 1481, 152 L.Ed.2d at 543; Karam v. N.J. Dep't of Envtl. Prot., 308 N.J.Super. 225, 233, 705 A.2d 1221 (App.Div.1998), aff'd o.b., 157 N.J. 187, 723 A.2d 943, cert. denied, 528 U.S. 814, 120 S.Ct. 51, 145 L.Ed.2d 45 (1999).
The Court has nevertheless staked out two narrow categories of regulatory action that generally will be deemed per se takings. Lingle, supra, 544 U.S. at 538, 125 S.Ct. at 2081, 161 L.Ed.2d at 887. The first is "where government requires an owner to suffer a permanent physical invasion of her property." Ibid. The second "applies to regulations that completely deprive an owner of all economically beneficial use of her property." Ibid. (quotation omitted).
Neither of these categories apply here. Closure of the northern access did not constitute a permanent invasion of defendants' property; nor did the closure completely deprive defendants of all economically beneficial use of their property. Testimony established that the highest and best use of defendants' property is as a shopping center; following the driveway closure, it continued to be used as a shopping center.
Thus, the regulatory action at issue here falls within the broad standards set forth in Penn Central Transportation Co., where the Court identified several factors that have particular significance in evaluating a takings claim. Lingle, supra, 544 U.S. at 538, 125 S.Ct. at 2081, 161 L.Ed.2d at 888; Tahoe-Sierra Pres. Council, supra, 535 U.S. at 330, 122 S.Ct. at 1483, 152 L.Ed.2d at 545; Mansoldo, supra, 187 N.J. at 59, 898 A.2d 1018. Primary among those factors is "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." Penn Cent., supra, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648; OFP, supra, 395 N.J.Super. at 581, 930 A.2d 442.
Also relevant is the character of the government action. Penn Cent., supra, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648; OFP, supra, 395 N.J.Super. at 581, 930 A.2d 442. "`Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,' and [the Supreme Court] has accordingly recognized ... that government may execute laws or programs that adversely affect recognized economic values." Penn Cent., supra, 438 U.S. at *636 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648 (quoting Mahon, supra, 260 U.S. at 413, 43 S.Ct. at 159, 67 L.Ed. at 325). Indeed, taking challenges have been dismissed "on the ground that, while the challenged government action caused economic harm, it did not interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute `property' for Fifth Amendment purposes." Id. at 124-25, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. "[I]n instances in which a state tribunal reasonably concluded that the health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land, [the Supreme Court] has upheld land-use regulations that destroyed or adversely affected recognized real property interests." Id. at 125, 98 S.Ct. at 2659, 57 L.Ed.2d at 649 (internal quotation marks and citation omitted).
Another way of phrasing this is that takings jurisprudence
has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the "bundle of rights" that they acquire when they obtain title to property.... [T]he property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; "as long recognized, some values are enjoyed under an implied limitation and must yield to the police power."
[Lucas, supra, 505 U.S. at 1027, 112 S.Ct. at 2899, 120 L.Ed.2d at 820 (quoting Mahon, supra, 260 U.S. at 413, 43 S.Ct. at 159, 67 L.Ed. at 325).]
See also Tahoe-Sierra Pres. Council, supra, 535 U.S. at 327, 122 S.Ct. at 1481, 152 L.Ed.2d at 543 (noting that where an owner possesses a full bundle of property rights, destruction of one strand of the bundle is not a taking); Simmons v. Loose, 418 N.J.Super. 206, 243, 13 A.3d 366 (App.Div.2011) (relying on bundle-of-rights analysis from Lucas); Karam, supra, 308 N.J.Super. at 234, 705 A.2d 1221 (stating that antecedent inquiry into nature of owner's estate is guided by citizens' understanding regarding bundle of rights they acquire when obtaining title to property).
The rights obtained when an individual acquires title to property are defined by state law. Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., ___ U.S. ___, 130 S.Ct. 2592, 2597, 177 L.Ed.2d 184, 192 (2010). For example, in Stop the Beach Renourishment, a case involving rights to a beach boundary area between property owners' dry land and submerged land owned by the State of Florida, the Supreme Court applied state law to determine what rights the owners had in littoral property and avulsions before deciding whether a taking had occurred. Id. at ___, 130 S.Ct. at 2611, 177 L.Ed.2d at 206. Likewise, in Karam, supra, 308 N.J.Super. at 235, 705 A.2d 1221, the question of whether the State's regulation of riparian land constituted a taking was examined in light of the interest that was vested in the property owner by state law.
In the instant matter, a property owner's right to access the State highway system is clearly defined by State law. While a property owner has a right of reasonable access to the State's highway system, he or she does not have an absolute right to access the highway from any particular point on his or her property. N.J.S.A. 27:7-90; State, by Comm'r of Transp. v. Weiswasser, 149 N.J. 320, 339-40, 693 A.2d 864 (1997); High Horizons Dev. Co. v. Dep't of Transp., 120 N.J. 40, 48-49, 575 A.2d 1360 (1990); State, by Comm'r of Transp. v. Dikert, 319 N.J.Super. 310, 318, *637 725 A.2d 119 (App.Div.), certif. denied, 161 N.J. 150, 735 A.2d 575 (1999); Mueller v. N.J. Highway Auth., 59 N.J.Super. 583, 595, 158 A.2d 343 (App.Div.1960). It follows then under the reasoning of Stop the Beach Renourishment, supra, ___ U.S. at ___, 130 S.Ct. at 2611, 177 L.Ed.2d at 206, and Penn Central, supra, 438 U.S. at 124-25, 98 S.Ct. at 2659, 57 L.Ed.2d at 648, that property owners' interests in any particular access point are not sufficiently bound up with their reasonable expectations of ownership to constitute "property" for Fifth Amendment purposes. Thus, modification or revocation of an access point, so long as free and reasonable access remains, does not constitute a taking.
This conclusion, derived from decisions of the United States Supreme Court, is consistent with the Access Act as well as the common law principle, long recognized in New Jersey, that changes in access per se are not compensable. See High Horizons, supra, 120 N.J. at 49, 575 A.2d 1360 (holding that limitation of access is accomplished under state's police power and is not compensable); Lima & Sons, Inc. v. Borough of Ramsey, 269 N.J.Super. 469, 476, 635 A.2d 1007 (App.Div.1994) (holding that "[w]here, by virtue of state action, access is limited but remains reasonable, there is no such denial of access as entitles the landowner to compensation"); State Highway Comm'r v. Kendall, 107 N.J.Super. 248, 252, 258 A.2d 33 (App. Div.1969) (noting that "[t]he law recognizes a `non[-]compensable interference with private highway access'"); State, by Comm'r of Transp. v. Charles Inv. Corp., 143 N.J.Super. 541, 544, 363 A.2d 944 (Law Div.1976) (holding that denial of access per se is non-compensable), aff'd o.b., 151 N.J.Super. 14, 376 A.2d 534 (App.Div. 1977), aff'd, 76 N.J. 86, 385 A.2d 1227 (1978); see also Washington Mkt. Enters., supra, 68 N.J. at 116, 343 A.2d 408 (noting that if regulatory action does not amount to a taking, "any loss that may have been suffered is damnum absque injuria"). Although changes in access may result in an owner suffering some diminution of property value, regulation under the police power "secures an `average reciprocity of advantage' to everyone concerned." Lucas, supra, 505 U.S. at 1018, 112 S.Ct. at 2894, 120 L.Ed.2d at 814 (quoting Mahon, supra, 260 U.S. at 415, 43 S.Ct. at 160, 67 L.Ed. at 326); see also Karam, supra, 308 N.J.Super. at 233, 705 A.2d 1221.
Of course, if the access that remains following DOT regulation is not reasonable, the property owner's Fifth Amendment rights are implicated. In such an event, both the Access Act, N.J.S.A. 27:7-98, and the common law, Weiswasser, supra, 149 N.J. at 339, 693 A.2d 864, require that the State acquire the property interest through condemnation. This result is also in accord with the reasoning of Penn Central, supra, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648, since lack of reasonable access would interfere with the property owner's distinct investment-backed expectations.
In this case, the remaining access to the Center is clearly reasonable. The Center retains two access driveways onto Route 73 and three additional driveways onto surrounding roads. Indeed, the most used driveway, handling more than fifty percent of the Center's traffic, is the one leading to Old Marlton Pike and that driveway was improved during the construction to create easier access onto Route 73. The record is bereft of any facts indicating that defendants were not left with reasonable access to their property. Moreover, as noted, defendants did not appeal from DOT's access determination and thus waived the issue of reasonable access.
In sum, DOT's decision to close the northern driveway did not constitute a *638 Fifth Amendment taking. Any diminution of value the Center might have suffered as the result of the change in access is therefore non-compensable.

C.
The issue remains then as to the true measure of compensation where, as here, there is only a partial condemnation. When private property is taken by the State for public use, the owner is entitled to compensation for the property taken; damages, if any, to any remaining property; and any additional compensation as may be fixed according to law. N.J.S.A. 20:3-29.
"Where the entire property is taken, just compensation is `the fair market value of the property as of the date of the taking....'" State, by Comm'r of Transp. v. Simon Family Enters., L.L.C., 367 N.J.Super. 242, 249, 842 A.2d 315 (App.Div.2004) (quoting State, by Comm'r of Transp. v. Silver, 92 N.J. 507, 513-14, 457 A.2d 463 (1983)). Where only a portion of the private property is taken, the owner "is not only entitled to just compensation for the fair-market value of the portion that has actually been taken, but also for the diminution in the value, if any, of the remaining land, referred to as `severance damages.'" Ibid.; accord Dikert, supra, 319 N.J.Super. at 323, 725 A.2d 119. In assessing severance damages, "the market value of the property remaining after a taking should be ascertained by a wide factual inquiry into all material facts and circumstances ... that would influence a buyer or seller interested in consummating a sale of the property." Silver, supra, 92 N.J. at 515, 457 A.2d 463.
A party seeking severance damages pursuant to a partial condemnation may only recover for losses in value directly attributable to the taking itself, however. Weiswasser, supra, 149 N.J. at 341, 693 A.2d 864. In Weiswasser, supra, for example, the Court determined that the property owner could only recover severance damages for loss of visibility if the loss arose directly from changes that occurred on the property taken. Id. at 344, 693 A.2d 864. Similarly, in Pub. Serv. Elect. & Gas v. Oldwick, 125 N.J.Super. 31, 34-35, 308 A.2d 362 (App.Div.), certif. denied, 64 N.J. 153, 313 A.2d 213 (1973), a property owner, over whose property a utility company condemned an easement for passage of transmission lines, sought severance damages for value lost due to the construction of three large towers on nearby land. The court held that the property owner could not recover damages arising from the total project, but instead was entitled to compensation only for damages caused by the use of the land actually taken from him. Id. at 36-38, 308 A.2d 362; see also, Dikert, supra, 319 N.J.Super. at 324, 725 A.2d 119 (holding that owners of access easement had no claim for severance damages arising from condemnation of servient tenement).
Following this reasoning, defendants here were only entitled to severance damages that arose directly from the property actually taken. The property taken was 0.23 acres in fee simple, 0.179 acres subject to a permanent slope easement, and a temporary easement in the parking lot where improvement work would be performed. The northern access was not taken in the condemnation as it had been modified in the prior administrative proceeding. Even if the access closure were considered to be an inseparable part of the construction project, the closing of a single access point did not amount to a Fifth Amendment taking because, as noted, the property retained reasonable access to the highway system. Thus, it still was not part of the property taken. Because defendants attributed their internal circulation *639 problemsand hence their loss of valuesolely to the access modification, any loss they experienced therefore did not arise directly from property taken and therefore severance damages were not recoverable.

II
In arguing otherwise, that they are entitled to compensation for diminution in value of the remainder due to on-site impacts caused by vehicular maneuverability, defendants rely primarily on the holdings in State v. Van Nortwick, 260 N.J.Super. 555, 617 A.2d 284 (App.Div.1992) (Van Nortwick I), and State v. Van Nortwick, 287 N.J.Super. 59, 670 A.2d 548 (App.Div.), certif. denied, 143 N.J. 320, 670 A.2d 1061 (1995) (Van Nortwick II). Amicus curiae Maple Shade Properties adds that the State should not be allowed to use the Access Act to avoid paying constitutionally-mandated just compensation for condemned property, basing its argument, as does its fellow amicus, New Jersey Coalition of Automotive Retailers, similarly on the Van Nortwick decisions, which they argue, hold that on-site damages are compensable when access changes are effected by the State. We find these decisions distinguishable.
In Van Nortwick I, supra, the State appealed from the verdict of a just compensation trial, arguing that the trial court had erred by allowing the defendant to present expert testimony concerning diminution of value caused by an access revocation and by allowing the jury to consider that evidence in awarding damages. 260 N.J.Super. at 557, 617 A.2d 284. The defendant owned a 1.65-acre parcel of land with 328 feet of frontage along Route 37. Ibid. In order to construct a highway improvement project, the State condemned 0.232 acres of the parcel, consisting of a strip of land 28.5 feet deep along the property's entire frontage. Ibid. Originally, the defendant had access to Route 37 from the full 328-foot frontage; after the taking, access was limited to 140 feet. Ibid. Further, the existing driveway onto Route 37 was moved to the back of the property and connected to Route 37 through a new right of way. Id. at 557-58, 617 A.2d 284.
A panel of this court concluded that because there was no dispute concerning the reasonableness of the remaining access, the trial court had erred by failing to exclude diminution of access as an element of damages. Id. at 558-59, 617 A.2d 284. In so doing, the court remarked in dicta that "[a]lthough a diminution of access may cause other conditions on the property itself which may be compensable, as for example, ... such things as a limitation of design options or on-site maneuverability, as long as the remaining access is reasonable, the diminution per se is not compensable." Van Nortwick I, supra, 260 N.J.Super. at 558, 617 A.2d 284. It reversed the just compensation award and remanded the matter for a new trial. Id. at 559, 617 A.2d 284.
Van Nortwick II, supra, involved the State's appeal after remand. 287 N.J.Super. at 62-63, 670 A.2d 548. At the remand trial, the Law Division had determined that the defendant was entitled to compensation for on-site impacts caused by the diminution of access. Id. at 63, 670 A.2d 548. The court held that such on-site impacts were compensable as part of severance damages and that a properly instructed jury could separate compensable on-site damage from non-compensable diminution per se damages. Ibid. Another panel of this court agreed and affirmed. Id. at 64, 670 A.2d 548.
In reviewing the facts, the panel noted that the most significant impacts of the taking would be on the property's depth and on its amount of buildable area. Ibid. *640 It further noted testimony from the defendant's expert that identified four separate types of on-site damage. Id. at 66, 670 A.2d 548. These were the need for a depth variance, the loss of buildable areas, the loss of design flexibility, and the limitation of on-site maneuverability. Van Nortwick II, supra, 287 N.J.Super. at 66, 670 A.2d 548. The expert opined that limitation of vehicular maneuverability would result not from denial of access to the highway per se, but from the location of a single driveway at the back of the lot. Ibid. Such access would not allow drivers to loop in one driveway and out another, but would require them to double-back on wide drive aisles. Ibid.
The court observed that both sides agreed that the access that remained to the property was reasonable. Id. at 67, 670 A.2d 548. It also observed that this was "not a typical `highway access' case where the property owner complains that the limitations on access causes [sic] inconveniences or business losses by the resulting need to follow a more circuitous route." Id. at 69, 670 A.2d 548. It framed the precise issue before the court as "whether a property owner is entitled to just compensation for on-site damages to his remaining property caused by the manner in which his access was limited." Id. at 70, 670 A.2d 548. In addressing this question, the court recognized that not all damages are compensable, particularly if those damages are speculative, incidental, or "peculiar to the owner as opposed to being directly attributable to the realty." Id. at 71-72, 670 A.2d 548.
The court found that the defendant's situation was similar to that of the condemnee in State, by Comm'r of Transp. v. Inhabitants of Phillipsburg, 240 N.J.Super. 529, 573 A.2d 953 (App.Div.1990), where the State's taking cut off one portion of a property's remainder from another. Van Nortwick II, supra, 287 N.J.Super. at 72, 670 A.2d 548. The Phillipsburg court had found that the loss in value was not solely due to the rerouting of traffic, but rather arose from the fact that the taking affected the ability of potential developers to develop the land. Ibid. (citing Phillipsburg, supra, 240 N.J.Super. at 547-48, 573 A.2d 953).
The court summarized Van Nortwick's arguments as follows:
Defendant's claim for severance damages included a claim that a potential developer would pay less for this land, not just because there was a smaller piece of land remaining (for which defendant was being separately compensated), and not just because access to his property from the highway would be limited (which the law did not recognize as compensable), but because the restriction and location of the limited access, combined with the prevailing zoning requirements in the town, caused his property to be less useful and less valuable in terms of its highest and best use.
[Id. at 72-73, 670 A.2d 548.]
The court found that there was ample credible testimony from which the jury could have concluded that a potential commercial developer would be restricted in the size, shape and number of structures he or she could build on the property. Id. at 73, 670 A.2d 548.
This is because room would have to be allowed for wider driving aisles on the property to permit cars to double back and exit from the same driveway they entered. That double-backing was directly due to the fact that the State had not only decreased the amount of defendant's access but also changed the location of it.
[Ibid.]
*641 Van Nortwick I simply set forth the well-established principle that loss of access per se is non-compensable.[5] Its language concerning damages for loss of on-site maneuverability was merely dicta, and, in any event, too vague, in that it failed to explain what "diminution of access" is or when it occurs.
Van Nortwick II is distinguishable. In the first instance, the case dealt with access revocation and not, as here, access modification, the former generally involving a greater deprivation than the latter. But more importantly, the court never considered whether the access revocation constituted a Fifth Amendment taking. That is doubtlessly because the State specifically included "the owner's right of direct access to and from the deceleration lane" in its description of the property to be condemned.[6] Thus, the court had no occasion to apply the jurisprudence of regulatory takings. Because the issue was not considered, Van Nortwick II is not dispositive when access revocation is effected through regulation and not condemnation.
The more compelling distinction between Van Nortwick II and the matter at hand, however, is fact-driven. All of the deleterious on-site effects cited in Van Nortwick II arose directly from the taking in fee. The need to relocate the access, the requirement for a depth variance, the loss of buildable area, and the loss of design flexibility all flowed directly from condemnation of the 28.5-foot strip at the front of the property, which reduced the parcel's depth by thirteen percent. Even limitations imposed by the construction of wider driving aisles stemmed directly from the taking, since if the access was simply moved to the back of the property but no land was taken, there would have been more room inside the property to accommodate driveways. Thus, as the Van Nortwick II court recognized, the damages claimed were not peculiar to the owner but were directly attributable to the realty. 287 N.J.Super. at 71-72, 670 A.2d 548. *642 This comports with the classic definition of severance damages as the diminution in the value of the remaining land that is directly attributable to the taking itself. Weiswasser, supra, 149 N.J. at 341, 693 A.2d 864. In other words, the damages that were awarded in Van Nortwick II arose from the condemnation in fee, not the relocation of access.
The same is not true of the instant matter, where the asserted severance damages stemmed solely from the access modification and not the taking. The rerouting of traffic in the Center was not caused by the condemnation of a small strip of land in the property's set-back. Indeed, the taking did not even require the closing of the northern driveway, as demonstrated by the fact that DOT's first set of modified plans allowed for that driveway to remain open. Although DOT determined that preventing egress from the driveway would further the purposes of traffic safety, nothing in the taking itself prevented the driveway from remaining at its original location. Thus, unlike Van Nortwick II, the matter here appears to be the "typical `highway access' case where the property owner complains that the limitation on access causes inconveniences or business losses by the resulting need to follow a more circuitous route." 287 N.J.Super. at 69, 670 A.2d 548.
Not only did the revocation of access in Van Nortwick cause a change in the property's highest and best use and impact its ability to meet zoning requirements, but it also comprised a substantial portion of the condemned property and caused a reduction of frontage and depth of the property. Here, in contrast, the change in access had no such effect and in fact there was an increase in the Center's road frontage on Route 73 and the takings fell entirely within the local setback requirements. Thus, the circumstances of this case are significantly different than those in Van Nortwick II, and for all the above reasons, do not warrant severance damages.

III
Despite the clear weight of authority holding otherwise, amici nevertheless contend that the State's two-pronged approach in using the access management process to acquire property and avoid paying just compensation for on-site damages caused by the change in access is inherently unfair to the property owner. We disagree.
As noted, the regulation of access is a separate administrative process distinct from the eminent domain action. Moreover, the process is transparent and affords property owners adequate procedural due process protections. Under the Access Act, property owners are entitled to early notification of the State's plans; the opportunity to meet with DOT officials to express concerns, submit alternate modification proposals, and request compensation; and the right to have the agency's decision reviewed. N.J.S.A. 27:7-89 to -98; N.J.A.C. 16:47-4.33.
In the case of modification, DOT's determination is reviewable internally and the property owner may challenge the agency's final decision by appealing to the Appellate Division. Ibid. In the case of revocation, the property owner is afforded a hearing in the Office of Administrative Law and may appeal the final agency decision to the Appellate Division. Ibid. Further, if access is revoked, and does not amount to a "taking," DOT is required to provide the property owner with all necessary assistance to secure reasonable alternate *643 access to the State highway system. N.J.S.A. 27:7-94(d). If the agency or court determines that reasonable access does not remain after the regulatory action, and thus a "taking" has occurred, then the Commissioner must file a condemnation action and provide the property owner with just compensation. N.J.S.A. 27:7-98.
Given the due process sufficiency of the legislative scheme, defendants' redress for the driveway closure was limited to the procedures set forth in the Access Act and DOT regulations promulgated thereunder. Significantly, defendants did not seek further review of the access determination within the DOT, nor did they appeal the agency's decision to this court. Therefore, their present claim for so-called severance damages arising from the internal effects of the access modification, which they consented to and left them with reasonable alternate access, may not be appropriately considered in the condemnation trial concerning the State's acquisition phase. Because the jury in this instance was instructed otherwise and allowed to compensate defendants for the alleged diminution in value due to impacts caused by poor vehicle maneuverability, the trial court committed reversible error for which a new trial is warranted.
Reversed and remanded for a new trial.
NOTES
[1] The State Highway Access Management Code prohibits an access point to be located on an acceleration ramp. N.J.A.C. 16:47-3.5(e)(6).
[2] This figure reflects a credit of $1,900 that Black allowed defendants for the cost of replacing certain landscaping and pavement.
[3] Modification is defined as "changing the number of access points." N.J.A.C. 16:47-4.33(c)(1). Revocation, on the other hand, is restricted to eliminating direct ingress or egress to the State highway and providing alternative access through a road other than the State highway. N.J.A.C. 16:47-4.33(d)(1). Thus, the regulatory action here was a modification and not a revocation.
[4] While the State Highway Access Management Code contemplates a hearing in the Office of Administrative Law in the case of a revocation, N.J.A.C. 16:47-4.33(d)(1), there is no similar provision applicable to a modification. We have no occasion to pass upon the distinction this regulation draws between revocation and modification.
[5] Most States generally recognize that regulation of access per se is non-compensable so long as the property retains a reasonable means of ingress and egress. See, e.g., Ark. State Highway Comm'n v. Union Planters Nat'l Bank, 231 Ark. 907, 333 S.W.2d 904, 912-13 (1960) (holding that loss of business attributable to change in traffic flow is non-compensable); W.R. Assocs. of Norwalk v. Comm'r of Transp., 46 Conn.Supp. 355, 751 A.2d 859, 874 (1999) (reasoning that since "[i]t is well known that damages resulting merely from circuity of access have been considered damnum absque injuria[,]" inconvenience is not a dispositive damage yardstick); Treat v. State, 117 N.H. 6, 369 A.2d 214, 215-16 (1977) (rejecting a landowner's claim for damages resulting from a highway reconstruction project that had limited his access and made his remaining property unsuitable for its highest and best use, because the plaintiff shared the hardship resulting from regulation with all other abutters); Merritt v. State, 113 Idaho 142, 742 P.2d 397, 397-400 (1986) (rejecting a plaintiff's complaint that the limitation of access would hamper the ability of large fuel trucks to make deliveries to his gas station and would increase congestion on nearby roads, and ruling that State regulation of private access onto a public road constituted a taking only when vehicular access to the property was totally destroyed), aff'd on reh'g, 113 Idaho 142, 742 P.2d 397 (1987). But see Narloch v. State of Wis., Dep't of Transp., 115 Wis.2d 419, 340 N.W.2d 542, 547 (1983) (finding that condemnees were entitled to damages for loss of highway access based on a specific provision of the Wisconsin statutes that included "[d]eprivation or restriction of existing right of access to highway from abutting land" as a factor for the condemnor to consider when arriving at the compensation to be paid).
[6] The State, of course, was authorized to condemn Van Nortwick's right of access. N.J. Const. art. IV, § 6, ¶ 3. Significantly, the revocation of highway access in Van Nortwick predated enactment of the Access Act and so obviously the revocation was not accomplished in accordance with the procedures and provisions of the Access Act.